IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

LUIS ALFONSO V.H.,                          )
                                            )
                    Petitioner,             )
                                            )
  v.                                        )          Civil Action No.: 5:20-cv-00042
                                            )
BANESSA CRISTINA A.Z.,                      )          By: Elizabeth K. Dillon
                                            )              United States District Judge
                    Respondent.             )

**MEMORANDUM OPINION**

Before the court is Luis Alfonso V.H.'s[1] (petitioner or father) request that the court

require his ten-year old daughter (A.J.V.A. or daughter) to return to Honduras pursuant to the

Hague Convention on Civil Aspects of International Child Abduction and the statute

implementing its remedies, the International Child Abduction Remedies Act (ICARA), 22 U.S.C.

§ 9001, *et seq.*  (Pet. For Return, Dkt. No. 2.)  Daughter was taken from Honduras to the United

States on April 10, 2019, by Banessa Cristina A.Z. (respondent or mother), her mother, for a visit

that was to last until their return on April 23, 2019.  Father, who had joint custody with mother,

consented to the visit, but mother and daughter never returned and now live in Virginia.

Both the United States and Honduras are Contracting States under the Hague Convention

on Civil Aspects of International Child Abduction (Hague Convention).  The Hague Convention,

as implemented through ICARA, was created with the purpose "to protect children

internationally from the harmful effects of their wrongful removal or retention and to establish

procedures to ensure their prompt return to the State of their habitual residence, as well as to

---

[1] The court will use initials throughout this opinion to protect the anonymity of the individuals involved in this case, particularly that of the minor child.  *See* Scheduling Order and Order Granting Emergency Motion (Dkt. No. 20) and Fed. R. Civ. P. 5.2(a)(3).

secure protection for rights of access."  Hague Convention on the Civil Aspects of International

Child Abduction, proclamation, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 ("Hague

Convention").  "[T]he primary purpose of the Hague Convention is 'to preserve the status quo

and to deter parents from crossing international boundaries in search of a more sympathetic

court.'"  *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001) (quoting *Friedrich v. Friedrich*, 983

F.2d 1396, 1400 (6th Cir. 1993)).  A court considering a Hague Convention petition has

jurisdiction only over the wrongful removal or retention claim.  *See* Hague Convention, art. 16.

Here, the parties agree that father has established a prima facie case of wrongful

removal/retention.  Thus, the parties agree that: "(1) the child was 'habitually resident' in the

petitioner's country of residence [Honduras] at the time of removal, (2) the removal was in

breach of the petitioner's custody rights under the law of his home state, and (3) the petitioner

had been exercising those rights at the time of removal."  *Bader v. Kramer*, 484 F.3d 666, 668

(4th Cir. 2007).

Once a petitioner has established a prima face case of wrongful removal/retention, return

of the child is required unless the respondent establishes one of several defenses.  *Id.* (citing

*Miller*, 240 F.3d at 398).  Thus, the issues before the court are limited to whether any defenses

are available to mother and whether she has sufficient proof to prevail on any defense.  Mother

advances three defenses: (1) the well-settled defense; (2) the wishes of daughter; and (3) the

grave risk defense.

After considering the testimony of the witnesses, stipulations of the parties, exhibits, and

arguments of counsel, the court will deny the petition for return because the petition was filed

more than one year following removal and daughter is now well-settled.

# I.  PROCEDURAL HISTORY

On July 8, 2020, petitioner/father filed a complaint requesting the return of his daughter to Honduras.[2]  (Pet. for Return.)  He also filed an emergency motion for preliminary relief and a verified brief supporting the same.  (Dkt. Nos. 3, 5.)  Mother filed a motion to dismiss the petition (Dkt. No. 28), arguing that the petition was not timely filed, but she only pursued the argument that the petition was filed over one year after the retention of daughter as part of the well-settled defense and not as an independent ground for dismissal.  Thus, the court will dismiss this motion as moot.  Mother's answer asserted the defenses of an untimely petition, failure of father to exercise custody rights at the time of removal/retention, grave risk to daughter upon return to Honduras, that daughter is now well-settled, and objections to return by daughter.  (Dkt. No. 27.)  Father replied to the answer, denying the viability of the defenses.  (Dkt. No. 34.)

The court engaged the services of Briana Stevens as guardian ad litem (GAL) for the child.  Stevens submitted a report on September 22, 2020 (GAL Report, Dkt. No. 46), to which the parties did not object.[3]  The parties also agreed that the court can consider the statements attributed in the report to daughter as daughter's testimony in lieu of calling her as a witness.

Following briefing, the court conducted an evidentiary hearing by videoconference.  (Dkt. No. 48.)  Father and mother both testified at the hearing.  Also testifying were David F., friend of father; Waleska V.H., father's sister; Ena L., mother's aunt; Ramon A., mother's brother; and Hector Ubaldo G.H. (Hector), mother's husband.  The court accepted various

---

[2]  While the complaint was signed by petitioner, it was unsworn.

[3]  The GAL interviewed father, mother, mother's husband Hector, and daughter.  The GAL also reviewed the pleadings, discovery, exhibits, photographs of daughter provided by father, and emails between father and Hector.

exhibits (some in English and Spanish, with translation) as evidence during the hearing.  (*See* Dkt. Nos. 49, 50.)

   After considering the entire record, the court makes the following findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a).  To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.

II.  FINDINGS OF FACT

   In most instances, the parties agree to the facts or do not dispute facts presented by the other party.  Where the facts are stipulated or undisputed, the court finds those facts.  The primary factual disputes are instances of domestic violence by father against mother that are denied by father.  The court will note specifically where facts are contested.

**A.  Travel to the United States**

   Father and mother lived together in Honduras from 2010 until 2014, but they never married.  They are the parents of daughter, who was born in Honduras in 2010.  It is clear to the court that both parties love their daughter.  Pursuant to an Order of the City of Catacamas, department of Olancho, entered on May 29, 2017, they are joint custodial parents, and father has access to and time with daughter from Sundays at 6:00 p.m. until Tuesdays at 6:00 p.m. (Pet'r's Ex. 1, Dkt. No. 50-1; Pet. for Return ¶ 13).

   In March 2019, mother approached father asking if he would agree to permit daughter to travel with mother to the United States because they intended to visit daughter's maternal grandmother.  Father signed an authorization for departure and return on March 27, 2019. (Pet'r's Exs. 3.1, 3.2, 3.3, Dkt. No. 50-3.)  On April 10, 2019, they came to the United States as planned on a tourist visa.  With them on the trip to the United States was Hector Ubaldo G.H., who mother married in September 7, 2016, and their three-year old child, A.G., who is

daughter's half-sister.  Mother and daughter were expected to return on April 23, 2019, but they never returned and have lived in Virginia ever since.  Indeed, when mother made the decision to bring daughter to the United States in April 2019, she intended to stay here because of difficulties she had in Honduras with father.  Mother also noted that she believes Honduras is a violent country.  Hector has since applied for an employment-based EB-2 visa, both Hector and mother have jobs in the United States, and they are waiting for responses on their green card applications.

The above facts are stipulated or undisputed, so the court finds those facts.

**B.  Father's Actions Following Daughter's Retention in the United States**

When mother and daughter did not return, father pursued several avenues to secure daughter's return to Honduras.  He tried contacting mother, but after receiving no answer, he talked to family members, including mother's aunt, Carmen Z., and was told she did not know why they had not returned.  After receiving no satisfactory answer, he began the process of attempting to secure daughter's return through legal channels.  He contacted the Central Authority of Honduras and formally requested the return of the child under the Hague Convention and placed a yellow alert on Interpol.  He filed an international restitution request on April 30, 2019 (Pet'r's Exs. 5A, 5B, Dkt. No. 50-5) – a week after the scheduled return date. According to the international restitution request, father spoke with daughter on April 25, 2019, he was told by relatives that mother planned to "lose her tourist Visa so she can work illegally," and he provided the aunt's current address (and a previous address) where mother and daughter were staying.  He knew mother and daughter were being housed there.[4]

---

[4]  Mother admitted to GAL that she refused to provide an address to father because she feared him.

The State Department sent a letter, dated October 18, 2019, to mother at the address provided by father (Pet'r's Exs. 6A, 6B, Dkt. No. 50-6; Pet'r's Exs. 14A, 14B, Dkt. No. 50-14), and mother responded on October 31, 2019 (Resp't's Ex. 6; Dkt. No. 49-23), indicating that she would oppose daughter's return to Honduras.  According to father's brief, he secured legal counsel in March 2020, but the petition was not filed until July 8, 2020.[5]

The above facts are stipulated or undisputed, so the court finds those facts.

**C.  Daughter's Life in Honduras**

Daughter was born in 2010 in Barrio Chilapa, Catacamas, Honduras.  Her parents were together from 2010 to 2014.  Most of her family—both on the paternal and the maternal sides— live in Honduras.  When in Honduras, she attended a private school called the New World Bilingual School.  Father paid the tuition, and she received good grades and was a good student at the school.  She participated in dance, but she is no longer interested in that.

Father has a college education with a degree in business administration.  He owns a restaurant and a bar, which now have been negatively impacted by the coronavirus.  His family also owns a dairy farm where he currently spends most of his time working, from approximately 6:00 a.m. to 2:00 p.m.  He lives in a house owned by his father in Honduras.  Also living there are his father (daughter's paternal grandfather); his sister Waleska (since 2017); a maid/nanny; his fiancée Oranis; and his one-year-old son with his fiancée, E.V.  Daughter has her own bedroom at the house, and father provided photographs of the bedroom and his house. According to the GAL Report, the photographs "depict a clean and appropriate residence."

---

[5]  While the motion for leave to proceed in forma pauperis was signed by father on June 26, 2020 (Dkt. No. 1), the record is clear that the filings with the court were not made until July 8, 2020 (Dkt. No. 2).  The in forma pauperis motion was granted on July 15, 2020.  (Dkt. No. 6.)  Father's brief asserts, without detail or evidence, that COVID-19 delayed the filing of the petition.  (Dkt. No. 42.)

(GAL Report 6.)

A custody order was issued in 2017.  After that, father exercised his visitation rights under that order from Sunday until Tuesday every week and would also watch daughter on holidays when mother traveled.  Daughter stated that she likes spending time with father and his fiancée Oranis, and she still has possessions at her father's home in Honduras.  She has not met her half-brother.  Father provided photographs of memorable and happy times he spent with daughter and he and Oranis spent with daughter.

In Honduras, mother worked at a store that sold school supplies from 2008 until April 2019.  Between 2015 and April 2019, she owned the store, working Monday through Saturday.  She closed the store before coming to the United States.  She owned a residence in Honduras and still owns it.  She married Hector in September 2016, and their child was born in 2017.  (GAL Report 7.)

While in Honduras, father and mother sometimes fought over issues concerning daughter.  Daughter was seeing a counselor in Honduras starting in 2015 because she was not acting like herself and her grades declined.  The sessions started at a rate of once per week and gradually decreased to once per month.  About three months prior to leaving for the United States in 2019, daughter's counselor determined that regular sessions were no longer necessary.

 Daughter had issues with allergies in Honduras but had medical and mental health care when needed.

The above facts are stipulated or undisputed, so the court finds those facts.

**D.  Daughter's Life in the United States**

Hector, mother, daughter, and her younger half-sister lived for approximately six months after arriving in the United States with Ena L., mother's aunt, who has lived in Harrisonburg,

7

Virginia, for seventeen years.  In September 2019, the family moved into their own home.  The home in Virginia is safe, clean, and appropriate.  It has electricity, running water, and sufficient food.  Daughter shares a bedroom with her younger half-sister, and each child has her own bed. When mother works and needs childcare, she relies on her mother or her aunt.  Aunt Ena testified that daughter is happy and content and is less stressed and more relaxed living in the United States.  Photographs were provided showing memorable and happy times together as a family in the United States.

Hector has a close relationship with daughter and has been involved in her upbringing since she was about five years old.  Daughter enjoys being with Hector, who she describes as "funny," and they all play games together.  Hector believes that daughter has adjusted well to living in the United States and "hardly misses Honduras at all."  The GAL also reports that daughter is very close to her stepfather and her younger half-sister.  Tellingly, the daughter describes her half-sister as "her world."  (GAL Report 12.)

Additionally, mother and father both have some family in the United States, and daughter reported attending gatherings with these family members.  She has established a bond with these family members and has made friends with her cousins.  She also reports making friends with her neighbors.

In the fall of 2019, daughter began attending elementary school in Virginia.  After some initial difficulty, due to the language barrier, her grades improved.  She has no learning disabilities and has not had issues with virtual learning since the onset of the current pandemic. One teacher remarked that she was "impressed at how quickly [daughter] adapted and made new friends."  (GAL Report 11 (citing Resp't's Ex. 3, Dkt. No. 50-20).)  And daughter "worked very hard" in the teacher's reading class "to improve fluency, as well as enhancing . . .

8

comprehension." (*Id.*)  She no longer needs an interpreter and speaks English perfectly.

Daughter reported that she really likes her school because she made friends and likes her teacher.

(GAL Report 11.)

Daughter is interested in playing soccer and participating in other activities, including

karate, but has been hindered by the COVID-19 pandemic.  She is eager to participate in social

activities when it is safe to do so.  She feels that both parents would encourage her to participate

in activities.  She used to dance in Honduras but no longer wants to take dance lessons.

Daughter is healthy, and the allergies she suffered from in Honduras have not been an

issue in the United States.  If medical or mental health care is needed, she has access.

The above facts are stipulated or undisputed, so the court finds those facts.

### E.  Testimony Regarding Domestic Violence

The factual disputes between the parties center around allegations and denials of

incidents of domestic violence between father and mother.  Mother testified to several specific

occasions of violence by father directed at mother, and father denies them all.

#### 1.  Mother's testimony

According to mother, father mistreated and humiliated her during their relationship, and

the situation became worse once the two were separated.  She testified that the abuse started with

pushing and shoving, but eventually father started to beat mother, causing her to decide to

separate from father.  She stated that father behaved more aggressively toward mother then,

trying to force her to reconcile with him.  Father is said to have threatened to kill mother and

keep daughter for himself.  Some of this conduct is corroborated by the testimony of Ramon Z.,

mother's brother, who lived with mother and daughter for a while beginning in 2014.  Sometime

in 2016, mother began dating Hector, her future husband, and father became more aggressive

when he realized mother had a new partner.

Hector testified that father made threats to both him and to mother beginning in 2015. When he was dating mother, he received calls and text messages from father threatening to kill him if he did not leave mother alone. After he married mother, father continued threatening mother over the phone.

Mother stated that, in total, she went to the police four times regarding issues with father, but she never received a satisfactory resolution.[6] She recounts the following instances as times when father engaged in threatening or physically abusive conduct.[7]

1) Father came to mother's house in a drunken state and attempted to sexually abuse mother; when mother resisted, father stated he would take daughter away from her. Daughter was present. Father hit mother, and mother fainted. Mother filed a police complaint against father, and father spent the night in jail. Mother agreed to dismiss the charge (or let the charge be dismissed) because authorities convinced her that she should not put father in jail due to the potential impact on daughter. After this incident, mother asked her brother to live with her for protection. It appears that this would have taken place sometime in 2014 because her brother started living with her in 2014.

2) Father broke the window of mother's car. This was corroborated by mother's aunt, Ena L., when she was visiting Honduras.

3) Father assaulted mother at her place of work. This was corroborated by mother's

---

[6] The court does not consider the mother's statements that father's connections, and his father's connections as a retired colonel, caused her not to get adequate relief through the court system in Honduras. Also, the court does not consider the theory that father was friends with the judge who issued the custody order. This is all speculation. While mother testified about threats to her business and surrounding businesses in March 2019, she did not attribute those threats to father.

[7] No time was approximated for some of the instances.

aunt, Ena L., when she was visiting Honduras.

4) Father climbed the exterior wall to mother's yard and yelled for mother to give him daughter, disturbing mother's neighbors. Daughter was present with her cousin. They locked themselves in a room and were scared.

5) In 2017, around Easter, mother and father had a dispute over custody. Mother went with her family, including daughter, to her grandparents' house to visit. When mother returned home, with daughter, father was waiting for her. He began yelling, blowing the horn of the car, and calling mother on the phone. She hung up her phone, and father responded by firing his gun in the air. Daughter was frightened, and it was difficult for her to fall asleep. That night, she wet her bed even though she had not used diapers for over a year. Mother filed a criminal complaint, but father was not convicted.

Hector describes this same incident as father attempting to start a fight with Hector. Father pounded on the door, fired his gun twice, and yelled that he was going to take his daughter from them. Daughter was scared, and that night she wet her bed.

**2. GAL Report and daughter's testimony**

While the GAL did not specifically mention many of the incidents discussed by mother and her witnesses to daughter, and daughter did not bring them up, daughter did corroborate the incident in 2017, during Holy Week, when father is alleged to have come to mother's house upset and intoxicated. He repeatedly sounded the horn of his car demanding to have the minor child for the holiday and fired his gun multiple times. Daughter remembered hiding in the closet with her cousin and wetting herself. Daughter also reported that she was aware that her parents argued on a regular basis when they lived in Honduras. She did not know why her parents fought, as mother did not want to talk about it, but she saw mother upset after the interactions.

### 3. Father's testimony

Father denied these incidents and denied harassing and threatening mother when asked by the GAL and at the hearing.  He also denied threatening Hector.  When specifically asked about allegations of threats and abuse at the hearing, father called the allegations lies and indicated that they must be bad people for telling the lies.  He did concede that the parties argued about issues pertaining to daughter, especially between 2014 and 2017 when there was no court order addressing parenting time, and acknowledged that he often lectured mother about bringing men around daughter.  He also acknowledged at the hearing that mother made an accusation of domestic violence against him in 2016.  (Pet'r's Exs. 15, 16, Dkt. Nos. 50-15, 50-16.)

Father's close friend, David H., who lived in father's home from 2010 to 2013 when father and mother were together and worked for father, never witnessed father being verbally or physically abusive toward mother or daughter.  Likewise, father's sister, Waleska V.H., who has lived in the same house as father since 2017 (well after mother moved out) and is a school principal, never witnessed father being verbally or physically abusive toward mother or daughter.

### 4. Documentary evidence

a.  In addition to the documents provided by father showing that there was no prosecution of him for family violence (Pet'r's Ex. 16, dated 8/16/2019) and that there had been a complaint filed against him on May 27, 2016, for which no sentence was imposed (Pet'r's Ex. 15), mother provided copies of complaints that she filed with the police in Honduras.

On May 26, 2016, she filed a complaint alleging that father came to her place of business to pick up daughter and threatened to take her daughter away and threatened to shoot "them" next time daughter was at mother's fiancé's home.  (Resp't's Ex. 5, page 4, Dkt. No. 50-22.)  In that same complaint, she mentioned an earlier incident on August 8 (presumably 2015) wherein

12

father allegedly broke a window in her car, and they went to court.

On April 17, 2017, she filed a complaint stating that the previous day father arrived at the house to argue with her and demand daughter. She stated that daughter was scared, and the events caused daughter to wet herself and not want to sleep by herself. (Resp't's Ex. 5, page 11).

b. Mother also supplied documentary evidence of threats made by father to Hector in December 2014, March 2015, and April 2015. (Resp't's Ex. 2, Dkt. No. 50-19). Father sent messages to Hector stating that if Hector did not respond, then father would show up at his house and start a fight. He sent messages in March 2015 saying, "It's almost your turn." And in April 2015, there is a message stating, "I have a pending issue with you." Messages in January 2016 were also included, noting a plan to kill Hector, but those messages were from an unknown source, so the court does not consider those.

**5. Findings by the court**

It is clear from the testimony that the parties argued about daughter, especially before the court order of May 29, 2017. Given the corroboration from daughter and the police reports and messages that were provided to the court, the court also finds that father did, at least, threaten mother and Hector on several occasions. The court also finds that father, during one incident, fired shots from a firearm and frightened daughter, as well as others. Although the alleged incidents are disturbing, they appear to have occurred prior to the Honduras court's entry of the May 2017 custody order. In that order, the Honduran court saw fit to grant joint custody, and that order stands.

Moreover, it is undisputed that when father realized his tactics were not working, he shifted to pursuing reconciliation, saying he would change, be a good father, and would support mother financially. According to mother, she relented and the two were on good terms.

13

Obviously, the relationship between the parties had healed sufficiently that father agreed to permit daughter's travel to the United States.  Importantly, daughter stated that she was not afraid of either parent.  Thus, the court finds that father does not pose a danger to daughter.

**F. Daughter's Testimony and Wishes**

It was clear to the GAL that daughter appreciated the gravity of the situation and the current legal proceedings.  The GAL characterized daughter as mature for her age because she gave the GAL her full attention and responded with thoughtful answers to questions asked of her. Initially, daughter's half-sister was present for the interview in their bedroom to make daughter more comfortable, but, eventually, the GAL and daughter were alone.

Daughter confided that she was nervous because she was worried about the outcome and was aware of the tension between her parents.  She stated that if she had the power to choose where to live, she would remain in Virginia.  She explained that she really liked her school and friends and would be very upset to live apart from her sister.  She told the GAL that she was fully transitioned into her school.  She recounted her initial difficulties, but that she improved her grades and did not have any issues with virtual learning.  She liked spending more time with her sister with virtual learning but also missed her classmates.  She likes her teacher.  She expressed that she had more "opportunities and options" at her school in Virginia.  When pressed by the GAL, she was unable to give specific examples but instead noted generally that there are more opportunities for her in the United States as she grows up regarding education and jobs.

Daughter also mentioned feeling safe in Virginia.  She said that in Honduras she would often feel unsafe, but she could only provide one example of a time where she felt unsafe.  She mentioned a man who would loiter near her school and described behavior suggesting mental illness, as the man would shout or yell at her and her friends.  Daughter mentioned interacting

with the man once directly, and she felt uneasy whenever seeing him again after that incident.

The GAL discussed daughter's extracurricular activities in Honduras, including dance, swimming, and martial arts.  Daughter acknowledged participating in these activities but stated that she could also perform them in Virginia.  When asked about her friends, she first named individuals in Virginia.  When asked about friends in Honduras, she mentioned her cousin and another girl.  She stated that she could call them if she wanted to, but she has not done so thus far.

Daughter told the GAL that she would like to see father but reiterated that she does not want to live in Honduras.  She would, however, like to visit her father and family members in Honduras even if she stays in Virginia.

The above facts are stipulated or undisputed, so the court finds those facts.

## G.  Communications Following Daughter's Retention in the United States

The parties provided testimony about the communications among them following retention of daughter in the United States.  Father admitted, in his international restitution request, that he spoke with daughter on April 25, 2019.  He also admitted that, although he has had some difficulty communicating with daughter, he has been able to speak to daughter from time to time.  Mother would allow father to have contact with daughter if mother was present for the phone conversation.  Daughter would also take the phone when father called and lock herself in her room to talk with father.  Sometimes, father could not reach daughter when mother was at work, but he could reach her when mother was not working.  Ena L. testified that for a while she was an intermediary for calls when father was attempting to reach mother and daughter.

Mother, Hector, and mother's Aunt Ena complained that sometimes father's calls to them were loud and argumentative, and they believed the calls to be angry and threatening.  Ena spoke

of calls wherein father accused her of helping mother kidnap daughter and made threats to call immigration authorities.  She and Hector noted that sometimes daughter could hear father's loud voice on the calls.  Father agreed that he did make several calls to mother because daughter did not return from the United States, and he was trying to understand what was happening and how to secure her return.

The court finds that, given the admission by mother that she lied to father about the visit to the United States and her intent not to return to Honduras and given her admitted wrongful detention of daughter in the United States, father sometimes expressed his anger in some of his calls to mother, Hector, and Aunt Ena.  The court also finds that father has been able to have some contact with daughter over the telephone since she has been in the United States, and daughter did not report any problems with these communications.  Instead, daughter reported that her parents' fighting has decreased significantly after moving to Virginia, which makes her happy.  Thus, regarding these communications, the court finds that father does not pose a danger to daughter.

## H.  Danger in Honduras

Some evidence was presented regarding the dangers of living in Honduras.  Mother reported receiving threats to her business in March 2019.  She and other businesses received notes stating that they must pay the equivalent of $50.00 to avoid harm to family members.  She did not want to start paying the requested amount because she knew the amount would increase over time.  Mother and Hector are not sure who was responsible for the threats or if they were gang related.

Mother's counsel provided an article from the State Department which noted that as of June 24, 2019, Honduras had a level three travel advisory rating, suggesting United States

16

citizens reconsider travel due to crime:

> Violent crime, such as homicide and armed robbery, is common.  Violent gang activity, such as extortion, violent street crime, rape, narcotics and human trafficking, is widespread.  Local police and emergency services lack sufficient resources to respond effectively to serious crime.

(GAL Report 27.)  Counsel also provided a New York Times article from 2019 discussing the New York jury conviction of the brother of the president of Honduras on cocaine trafficking charges.  According to the article, witness testimony at the trial indicated that Honduran President Juan Orlando Hernandez "looked the other way in exchange for millions of dollars for his and his party's political campaigns."  (*Id.*)

Significantly, however, most of mother's family and all of Hector's family still live in Honduras.  There were no reports from them as to any current dangers.  Also, father has denied that the area is dangerous.  He stated that crime is prevalent in the capital and larger cities but asserts that Catacamas is a safe, small town. He was unaware of any gang activity in the town and stated that daughter would be safe.

The court finds that the facts provided at the hearing are insufficient for the court to find that living in Honduras would present a danger to daughter.[8]

### III.  CONCLUSIONS OF LAW

As noted above, the parties agree that the father has established a prima facie case of wrongful removal/retention.  Because father has established a prima facie case of wrongful removal/retention, daughter's return is required unless mother establishes one of several defenses.  Thus, the legal issues before the court are limited to whether any defenses are

---

[8] Respondent argues that returning to Honduras would damage daughter psychologically.  Other than evidence that daughter is well-settled in the United States, absolutely no evidence was presented to support this argument.

available to mother and whether she has sufficient proof to prevail on any defense.  Mother

asserts three defenses: (1) the well-settled defense; (2) the wishes of the minor child; and (3) the

grave risk defense.  Because the court finds that daughter is well-settled in the United States, the

court will forego discussion of the remaining defenses.

The well-settled defense may be asserted only when an "action [is] not commenced

within one year of the abduction."  *Miller*, 240 F.3d at 402 n.14; *accord Malmgren v. Malmgren*,

747 F. App'x 945, 946 (4th Cir. 2019) ("Article 12 states '[t]he general rule that when a court

receives a petition for return within one year after the child's wrongful removal, the court shall

order the return of the child forthwith.'") (quoting *Lozano v. Alvarez*, 572 U.S. 1, 5 (2014));

*Smedley v. Smedley*, No. 7:14-CV-66-F, 2014 WL 11996390, at *11 (E.D.N.C. Apr. 28, 2014).

The abducting parent bears the burden of showing, by a preponderance of the evidence, that the

action was not commenced within one year of the abduction and that the child is well-settled.

*Bader*, 484 F.3d at 668–69.

This action was not commenced within one year of the abduction/retention, and no one

argues otherwise.  While father did act quickly in beginning the process of pursuing the return of

his daughter, he did not file his petition soon enough to avoid the assertion of a well-settled

defense.   Father filed this action in July 2020, more than a year after mother took daughter and

moved her to the United States in April 2019.

Father has not provided, and the court has been unable to locate, any case law which

would justify equitable tolling in this case.  In some cases, equitable tolling of the one-year

period has been found proper where a child's whereabouts were concealed.  *See, e.g.*, *Van*

*Driessche v. Ohio-Esezeoboh*, 466 F. Supp. 2d 828, 848 (S.D. Tex. 2006) (stating that the

"purpose of equitable tolling" in a Hague Convention case raising the well-settled defense is "to

ensure that a parent who takes intentional and significant steps to conceal his or her children for more than one year will not be rewarded for that misconduct by creating eligibility for an affirmative defense not otherwise applicable"); *Belay v. Getachew*, 272 F. Supp. 2d 553,565 (D. Md. 2003) ("Because Respondent concealed the child from Petitioner . . ., she is estopped from asserting the Article 12 defense.").  But, in this case and despite mother not providing father with her address, father knew the location of his daughter and provided an address in his international restitution request as early as April 30, 2019.  He had family members in the United States that had contact with daughter.  The address he provided to the State Department produced a response by mother in October 2019.

Furthermore, no argument was made that there was any delay in filing the petition caused by concealment.  Rather, the only argument was that the petition was delayed by the COVID-19 pandemic because father retained counsel in the United States in March 2020.  No evidence was provided about how COVID-19 caused petitioner to be delayed until July in filing his petition.

Therefore, the court finds that mother has established this portion of the well-settled affirmative defense by a preponderance of the evidence.  Thus, the court now turns to whether daughter is well-settled in the United States.

The United States Department of State has declared that "nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof" under the well-settled defense.  Hague Int'l Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (March 26, 1986). Importantly, "[a] removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted."  *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996).  Even so, Article 12

represents "the conviction of the drafters that even if a wrongful removal has occurred, it might be *worse* to order the child to be uprooted again after the passage of a certain amount of time." *Belay,* 272 F. Supp. 2d at 562 (emphasis in original). After the passage of a year, it becomes "a reasonable possibility that the child could be harmed by . . . removal from an environment into which the child has become settled," and "a court ought to be allowed to consider this factor in making the decision whether to order the child's return." *Anderson v. Acree*, 250 F. Supp. 2d 872, 875 (S.D. Ohio 2002).

The Hague Convention and ICARA are silent regarding what factors a court should weigh in making "well-settled" determinations. Because of this lack of statutory guidance, courts should consider "any relevant circumstance that demonstrates security, stability, or permanence—or the lack thereof—in a child's new environment. Such a totality of the circumstances analysis serves the purpose of the 'settled' exception." *Alcala v. Hernandez*, 826 F.3d 161, 170–71 (4th Cir. 2016) (citations omitted). In determining whether a child is well-settled within the meaning of Article 12, courts have considered a number of factors that bear on whether the child has "significant connections to the new country." Text and Legal Analysis, 51 Fed. Reg. at 10509. Some factors may include: (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability. *In re B. Del C.S.B.*, 559 F.3d 999, 1009 (9th Cir. 2009). There is no formulaic method to scale or weigh any of these factors or considerations. *Alcala*, 826 F.3d at 171. The court's inquiry is one of a holistic nature in determining whether a child has significant connections demonstrating a

secure, stable, and permanent life in the new environment.  *Id.*

Substantial evidence demonstrates, by a preponderance, *see Bader*, 484 F.3d at 668–69; *De La Riva v. Soto*, 183 F. Supp. 3d 1182, 1200 (M.D. Fla. 2016), that daughter is well-settled in the United States.  Daughter has been living in the United States since April 2019, more than a year and a half, and she has become used to and is familiar with her surroundings in Virginia.  She regularly attends school, is doing well and getting good grades, and has become fluent in English.  She has friends and family members for support, particularly her younger sister A.G., with whom she has developed a strong relationship.  Importantly, members of mother's family and members of father's family are present in Virginia.  Thus, daughter can visit relatives from the maternal and paternal sides of her family, and her family network appears to be broad and strong in Virginia.  In addition, mother and Hector are both employed, and after a few months living with Aunt Ena, daughter has a stable home.  Under similar circumstances, minor children have been found to be well-settled.  *See Alcala v. Hernandez*, No. 4:14-CV-04176-RBH, 2015 WL 4429425, at *10 (D.S.C. July 20, 2015) (finding that the minor children were well-settled in their new environment based on the stability of their residence, the minor children's adoption of the English language, church attendance, respondent's employment and financial stability, and the network of family and friends in the new area); *Belay*, 272 F. Supp. 2d at 560 (finding child well-settled where she was enrolled in school, had many friends, and consistently resided at the same address, even though the non-custodial parent was not informed of the child's whereabouts).

The court also finds that daughter's age and maturity are significant factors.  At ten years old—and a mature ten years old given her insight, according to the GAL—daughter's connections to her surroundings are more enduring and meaningful than a younger child's might

be.  *See Belay*, 272 F. Supp. 2d at 561 (finding that the child's age of nine weighed in favor of

the child being well-settled; "at a certain age a child might be old enough 'to allow meaningful

connections to the new environment to evolve'") (quoting *In re Robinson*, 983 F. Supp. 1339,

1345–46 (D. Colo. 1997)).

Also important is that the instability caused by the frequent arguments between mother

and father has largely been alleviated since daughter's arrival in the United States.  She appears

well-settled because, as she reports, "the relationship between Mother and Father was

contentious when she resided in Honduras . . . [but] her parents do not fight as often" since

moving to the United States.  (GAL Report 26).

While daughter is not participating in extracurricular activities, this is due to the

coronavirus and its effect on the availability of opportunities for such activities for everyone.

The GAL notes that daughter "would have played soccer and started karate lessons if not for the

coronavirus."  (GAL Report 30.)  Her desire to play sports in the future is another factor that

weighs in favor of a well-settled finding.  *See Diaz Arboleda v. Arenas*, 311 F. Supp. 2d 336, 343

(E.D.N.Y. 2004) (weighing in favor of a well-settled determination that child wants to try out for

the football team when he is old enough).

The only fact weighing against a well-settled finding is father's difficulty on occasion in

contacting the minor child.  Father, however, has admittedly had telephone conversations with

daughter.  Even considering father's issues contacting daughter, the preponderance of the

evidence clearly supports a finding that daughter is well-settled in the United States.

The court thus finds, by a preponderance of the evidence, that daughter is well-settled in

the United States.  The court may exercise discretion and is not required to return a child when

the well-settled defense is established.  But, the court finds no reason, given the establishment of

the affirmative defense, to return daughter to Honduras.  While mother did retain daughter and lied to father about her intent to return with daughter, and father was diligent in pursuing remedies, those facts do not outweigh daughter's interest in remaining in her stable environment in the United States.  She is well-settled, and the court will not exercise its discretion to return her.

The court makes clear that it does not, and has no authority to, determine custody or modify the terms of the custody order of the Honduran court.  The court also makes clear that its ruling does not preclude daughter from having contact, whether in person or by telephone or other means, with father, and, in fact, the court encourages regular contact between daughter and father.

The court will issue an appropriate order denying the petition for return.

Entered: January 8, 2021.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge